UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
NEW ALBANY DIVISION

| | | |
|---|---|---|
| CITY OF AUSTIN, INDIANA, | ) | |
| A POLITICAL SUBDIVISION OF | ) | |
| THE STATE OF INDIANA | ) | |
| | ) | |
| | ) | Case No:  4:21-cv-57 |
| Plaintiff | ) | |
| vs. | ) | Jury Trial Requested |
| | ) | |
| MCKINSEY & COMPANY, INC.; | ) | |
| MCKINSEY & COMPANY, INC. | ) | |
| UNITED STATES;   and | ) | |
|  MCKINSEY & COMPANY, INC. | ) | |
| WASHINGTON D.C. | ) | |
| | ) | |
| Defendants. | | |

---

**CLASS ACTION COMPLAINT**

---

COMES NOW THE PLAINTIFF**, the City of Austin, a political subdivision of the State of Indiana,** and brings this action against Defendant, **McKinsey and Company, Inc., et al** (Collectively "McKinsey" or "Defendant") for Violating the Indiana Deceptive Consumer Sales Act, Ind. Code §§ 24-5-05 et seq., and other violations of law as outlined herein and states as follows:

## I.    PLAINTIFF

1.         Plaintiff **is** the City **of Austin a political subdivision of the State of Indiana,** and  is authorized to bring this action in that it has quasi-sovereign interest in the health and well-being physically and economically of its citizens who have suffered because of McKinsey's conduct in the City of Austin.

2.         The City of Austin that has been damaged, and continues to be damaged by the Defendant's conduct Plaintiff is responsible for the public health, safety and welfare of their citizens.

3.         In the City of Austin, opioid abuse, addiction, morbidity and mortality has created a serious public health and safety crisis, is a public nuisance, and Defendant's actions have caused and contributed to this public nuisance.

4.         Defendant's actions created the foreseeable opioid crisis and public nuisance for which  Plaintiff seeks relief.

5.         Plaintiff has sustained economic damages as a direct and proximate result of Defendant's conduct as alleged herein.  Categories of past and continuing damages include, but are not limited to; (1) costs associated with law enforcement and public safety relating to the opioid epidemic: (2) costs for providing emergency services,

medical care, therapeutic care, and other treatments for patients suffering from opioid-related addiction or disease, including overdoses and deaths; (3) costs for prescription drug purchases; and (4) such other costs as may be proven in this litigation.

6.      The City of Austin brings this action on its behalf, and on behalf of all other Indiana counties and municipalities similarly situated and seeks the means to abate the opioid epidemic created by Defendant's wrongful and/or unlawful conduct: prosecute any person or entity who creates, continues or contributes to such nuisance; and to prevent injury and annoyance from such nuisance.

## II.      DEFENDANT

7.      Defendant **McKinsey & Company, Inc.** is a corporation organized under the laws of the State of New York, whose principal place of business is located at 711 Third Avenue, New York, NY 10017.

8.      Defendant **McKinsey & Company, Inc. United States** is a corporation organized under the laws of the State of Delaware, whose principal place of business is located at 55 E 52nd Street, New York, NY 10022.

9.      Defendant **McKinsey & Company, Inc. Washington D.C.** is a corporation organized under the laws of the State of Delaware, whose principal place of business is located at 1200 19th Street, NW, Suite 1100, Washington DC 20036, and at all times relevant hereto was authorized to do business and was doing business in the State of Indiana.

10.      McKinsey & Company, Inc., McKinsey & Company, Inc. United States and McKinsey & Company, Inc. Washington D.C. are referred to collectively as "McKinsey or

Defendant."

11.      McKinsey is a worldwide management consultant company. From approximately 2004-2019, McKinsey provided consulting services to Purdue Pharma L.P., working to maximize sales of OxyContin and knowingly perpetuating the opioid crisis. McKinsey has also provided related consulting services to other manufacturers of opioids.

12.      At all times relevant to this proceeding, McKinsey did business in the City of Austin.

### III.      JURISDICTION AND VENUE

13.      Jurisdiction of this Court arises under the laws of the United States 28 U.S.C. § 1332(d) as this is a class action, the plaintiff is a citizen of different states and the amount in controversy exceeds $5,000,000, exclusive of interest and costs.

14.      Jurisdiction arises over the Defendant pursuant to Indiana Code 4-6-1-6 and Indiana Code 24-5.0.5-4 because McKinsey has transacted business within the state at all times relevant to this Complaint.

15.      This Court has personal jurisdiction over Defendant because, at all relevant times, Defendant has purposely availed themselves to the privilege of doing business in Indiana, including by engaging in the business of researching, designing, and implementing marketing and promoting strategies for various opioid manufacturers, including Purdue, in support of their sales and marketing of opioids in Indiana. Further, Defendant does business by agent in Indiana, directly and through the purposeful direction of their actions towards Indiana, and have the requisite minimum contacts with Indiana necessary to constitutionally permit the exercise of jurisdiction.

16.         Venue is proper here because a substantial part of the events or omissions giving rise to the claims occurred in the City of Austin, and all other related claims are also proper as additional claims against the named Defendant.   Further, Defendant has caused harm to the Plaintiff and to Class Members residing in the District.

17.         The Court also has supplemental jurisdiction over the Plaintiff's state law claims pursuant to 28 U.S.C. § 1367 because the state law claims are part of the same case or controversy.

## IV.        STATEMENT OF THE CASE

18.         Beginning in the mid-199OS, opioid manufacturers pursued aggressive sales strategies to increase sales of their prescription opioids, plan that resulted in dramatic rise in opioid prescriptions in the City of Austin. The rise in opioid prescriptions caused an equally devastating rise in opioid abuse, dependence, addiction, and overdose deaths.

19.         Prescription opioids continue to kill hundreds of people across Indiana every year. Thousands more suffer from negative health consequences short of death and countless others have had their lives ruined by friend or family member's addiction or death. Every community in Indiana suffers from the opioid crisis of addiction and death.

20.         McKinsey worked with entities involved in manufacturing and selling opioids contributed to the opioid crisis.

21.          McKinsey is one of the world's largest consulting companies. Its partners work worldwide for corporations and governments across diverse industries. Its influence is vast because of its best-in-class reputation. McKinsey sells the notion that it can take

whatever company or government is doing and makes them do it better.

22.        The plaintiff brings this action against McKinsey for the consulting services it provided to opioid companies in connection with designing the companies' marketing plans and programs that helped cause and contributed to the opioid crisis. McKinsey sold its ideas to OxyContin maker Purdue Pharma, L.P. ("Purdue") for more than fifteen years, from 2004 to 2019, including before and after Purdue's 2007 guilty plea for felony misbranding.

23.        McKinsey advised Purdue and other manufacturers to target prescribers who write the most prescriptions, for the most patients, and thereby make the most money for McKinsey's Clients.

24.        Early in their relationship, McKinsey advised Purdue that it could increase OxyContin sales through physician targeting and specific messaging to prescribers. These McKinsey strategies formed the pillars of Purdue's sales tactics for the next fifteen years.

25.        In 2008, McKinsey worked With Purdue to develop its FDA mandated risk evaluation and mitigation strategy ("REMS"). McKinsey advised Purdue to "band together" with other opioid manufacturers toward class REMS to "formulate arguments to defend against strict treatment by the FDA." Ultimately, the FDA adopted class-wide REMS that resulted in high dose OxyContin remaining subject to the same oversight as lower-dose opioids.

26.        In 2009, Purdue hired McKinsey to increase "brand loyalty" to OxyContin. McKinsey recommended the best ways to ensure loyalty to the brand by targeting

specific patients, including patients new to opioids, and developing targeted messaging for specific prescribers.

27.       Purdue thereafter adopted McKinsey's proposed prescriber messaging and patient targeting advice and incorporated them into Purdue's marketing and sales strategies.

28.       In 2013, McKinsey conducted another analysis of OxyContin growth opportunities for Purdue, and laid out new plans to increase sales of OxyContin. Among the key components of McKinsey's plan were to:

  a. focus sales calls on high-Volume opioid prescribers, including those who wrote as many as 25 times as many OxyContin scripts as their lower volume counterparts;

  b. remove sales representative discretion in target prescribers;

  c. focus Purdue's marketing messaging to titrate higher, more lucrative dosages;

  d. significantly increase the number of sales Visits to high—Volume prescribers, and;

  e. create an "alternative model for how patients receive OxyContin," including direct distribution to patients and pharmacies, to help address the "product access" problem.

29.       Purdue approved McKinsey's plan, and together with McKinsey, moved to implement the plan to "Turbocharg[e] Purdue's Sales Engine," under the name Evolve Excellence ("E2E"). E2E significantly increased Purdue's opioid sales, in particular, for OxyContin.

30.       McKinsey partners participated as part of an Executive Oversight Team and Project Management Office, reporting to Purdue's Executive, the Purdue board, and with the Sacklers, individually. McKinsey worked side by side with Purdue and helped

Purdue plan and implement E2E, assisting with sales representative training, productivity, messaging, and call plans, IT systems, promotional strategies, and market forecasting.

31.     In developing the targeted messaging to increase sales of OxyContin, McKinsey conducted significant market research, including through ride alongs with Purdue sales representatives to learn how they promoted OxyContin. McKinsey carefully monitored Purdue sales representatives and provided guidance on prescriber messaging and adhering to target prescriber lists. McKinsey advised that sales representatives do more to promote the so-called abuse deterrent properties of reformulated version of OxyContin to address prescriber concerns about abuse risk.

32.     When large pharmacy chain took steps to scrutinize suspicious opioid orders, McKinsey stressed to Purdue's owners the "need for action" on this "urgent" issue affecting OxyContin. McKinsey told Purdue's owners to engage in senior level discussions with the pharmacy chain, increase efforts with patient advocacy groups to clamor against dispensing limits, and accelerate considerations of an alternative distribution channel, such as delivering OxyContin directly to patients through mail-order pharmacies.

33.     After E2E, McKinsey continued to work with Purdue, including on project that identified the growing addiction crisis as profit-making opportunity. McKinsey told Purdue that it should strive to become provider across the spectrum of drug abuse and addiction because of the opportunities it presented. McKinsey advised Purdue to get

into the manufacturing and marketing of opioid rescue and treatment medications in

order to profit from the realities of dependence, addiction, and abuse. Indeed, in 2018,

Purdue owner Dr. Richard Sackler received patent for drug to treat opioid addiction.

34.         McKinsey also partnered With Purdue to test program called FieldGuide,

proprietary software that McKinsey sought to license to other manufacturers. This

software would enable other opioid manufacturers to target and aggressively pursue

high-Volume prescribers.

35.         McKinsey continued to design and develop ways that Purdue could increase

sales of OxyContin well after the opioid epidemic peaked. One proposal McKinsey

recommended was for Purdue to pay "additional rebates on any new OxyContin related

overdose or opioid use disorder diagnosis." McKinsey advised Purdue on its strategies to

obtain and maintain broad formulary coverage for OxyContin with insurers and

pharmacy benefit managers, even as payers began reducing coverage for OxyContin as

the opioid crisis mounted.

36.         Subsequently, in the wake of hundreds of thousands of opioid deaths and

thousands of lawsuits, McKinsey proposed plan for Purdue's exit from the opioid

business whereby Purdue would continue selling opioids as way to fund new Purdue

ventures. According to McKinsey, this change was necessary because of the negative

events that materially compromised the Purdue brand.

37.         McKinsey's work for opioid manufacturers extended beyond Purdue. McKinsey

earned millions of dollars designing and implementing marketing programs for the

country's largest opioid manufacturers, including Johnson Johnson and Endo, increasing the sale and use of opioids in the United States and the City of Austin. McKinsey designed and implemented for other opioid manufacturers marketing plans similar to those it created for Purdue.

38.      At the same time McKinsey was working for opioid companies, McKinsey also consulted with governments and non-profits working to abate the raging opioid crisis crisis that McKinsey's own research showed was caused in large part by prescription opioids.

39.      There are indications that individuals at McKinsey considered destroying or deleting documents related to their work for Purdue.

40.      In 2019, McKinsey announced that it no longer worked for Purdue or other opioid manufacturers. But the harm created by McKinsey' marketing plans for opioid manufacturers has not stopped.

41.      Opioids have killed thousands in Indiana, and continue to ravage the lives of many more, creating one of the largest public health epidemics in the country's history. Economically, the toll is equally grim. The opioid crisis has forced Indiana to pay billions of dollars for increased costs in health care, child welfare, criminal justice, and many other programs needed to abate the epidemic.

42.      Months after McKinsey stopped its opioid work, Purdue filed for bankruptcy. More than hundred thousand individuals filed claims for personal injuries. States and

local governments filed claims for trillions of dollars incurred as result of the opioid crisis. Another McKinsey client, opioid manufacturer Mallinckrodt plc, similarly filed for bankruptcy protection in October 2020.

42.     In 2019, an Oklahoma state court found that McKinsey client Johnson Johnson helped cause the opioid epidemic in Oklahoma, ordering it to pay $465 million to help abate the crisis.

43.     In 2020, Purdue pleaded guilty to three felonies as result of conduct spanning decade from 2007 to 2017 during which Purdue worked side-by—side With McKinsey to design and implement marketing campaigns to increase dangerous opioid sales.

44.     In 2020, Purdue and the members of the Sackler family who owned Purdue also settled civil claims by the Department of Justice for hundreds of millions of dollars. The materials filed in connection With that plea and settlement agreements contain statement of facts regarding McKinsey's conduct and involvement in the conduct leading to the civil claims against Purdue and the Sackler family.

## VI.     ADDITIONAL FACTUAL ALLEGATIONS COMMON TO ALL COUNTS-
## THE OPIOID EPIDEMIC

45.     The past two decades have been characterized by increasing abuse and diversion of  prescription drugs, including opioid medications, in the United States.[1] Prescription opioids have become widely prescribed. By 2010, enough prescription

---

[1] *See* Richard C. Dart et al, *Trends in Opioid Analgesic Abuse and Mortality in the United States*, 372 N. Eng. J.  Med. 241 (2015).

opioids were sold to medicate every adult in the United States with a dose of 5 milligrams of hydrocodone every 4 hours for 1 month.[2]

46.    By 2011, the U.S. Department of Health and Human Resources, Centers for Disease Control and Prevention, declared prescription painkiller overdoses at epidemic levels. The News Release noted:

    a.  The death toll from overdoses of prescription painkillers has more than tripled in the past decade.

    b.  More than 40 people die every day from overdoses involving narcotic pain relievers like hydrocodone (Vicodin), methadone, oxycodone (OxyContin), and oxymorphone (Opana).

    c.  Prescription drug abuse is a silent epidemic that is stealing thousands of lives and tearing apart communities and families across America.

    d.  Almost 5,500 people start to misuse prescription painkillers every day.[3]

47.    The number of annual opioid prescriptions written in the United States is now roughly equal to the number of adults in the population.[4]

48.    Many Americans are now addicted to prescription opioids, and the number of deaths due to prescription opioid overdose is unacceptable. In 2016, drug overdoses killed roughly 64,000 people in the United States, an increase of more than 22

---

[2] Katherine M. Keyes at al., *Understanding the Rural-Urban Differences in Nonmedical Prescription Opioid Use and Abuse in the United States*, 104 Am. J. Pub. Health e52 (2014).

[3] *See* Press Release, Ctrs. for Disease Control and Prevention, U.S. Dep't of Health and Human Servs., Prescription Painkiller Overdoses at Epidemic Levels (Nov. 1, 2011), https://www.cdc.gov/media/releases/2011/p1101_flu_pain_killer_overdose.html.

[4] *See* Califf et al., *supra* note 3.

percent over the 52,404  drug deaths recorded the previous year.[5]

49.        Moreover, the CDC has identified addiction to prescription pain medication as the strongest   risk factor for heroin addiction. People who are addicted to prescription opioid painkillers  are forty times more likely to be addicted to heroin.[6]

50.        Heroin is pharmacologically similar to prescription opioids. The majority of current heroin  users report having used prescription opioids non-medically before they initiated heroin  use. Available data indicates that the nonmedical use of prescription opioids is a strong risk  factor for heroin use.[7]

51.        The CDC reports that drug overdose deaths involving heroin continued to climb sharply,  with heroin overdoses more than tripling in 4 years. This increase mirrors large increases  in heroin use across the country and has been shown to be closely tied to opioid pain  reliever misuse and dependence. Past misuse of prescription opioids is the strongest risk  factor for heroin initiation and use, specifically among persons who report past-year  dependence or abuse. The increased availability of heroin, combined with its relatively low price (compared with diverted prescription opioids) and high

---

[5] *See* Ctrs. for Disease Control and Prevention, U.S. Dep't of Health and Human Servs., Provisional Counts of Drug  Overdose Deaths, (August 8, 2016), https://www.cdc.gov/nchs/data/health_policy/monthly-drug-overdose-death-estimates.pdf.

[6] *See* Ctrs. for Disease Control and Prevention, U.S. Dep't of Health and Human Servs., *Today's Heroin Epidemic*,  https://www.cdc.gov/vitalsigns/heroin/index.html (last updated July 7, 2015).

[7] *See* Wilson M. Compton, *Relationship Between Nonmedical Prescription-Opioid Use and Heroin*, 374 N. Eng. J. Med. 154 (2016).

purity appear to be major  drivers of the upward trend in heroin use and overdose.[8]

52.        The societal costs of prescription drug abuse are "huge."[9]

53.        Across the nation, local governments are struggling with a pernicious, ever-expanding  epidemic of opioid addiction and abuse. Every day, more than 90 Americans lose their  lives after overdosing on opioids.[10]

54.        The National Institute on Drug Abuse identifies misuse and addiction to opioids as "a  serious national crisis that affects public health as well as social and economic welfare."[11]  The economic burden of prescription opioid misuse alone is $78.5 billion a year, including  the costs of healthcare, lost productivity, addiction treatment, and criminal justice  expenditures.[12]

55.        The U.S. opioid epidemic is continuing, and drug overdose deaths nearly

---

[8] *See* Rose A. Rudd et al., *Increases in Drug and Opioid Overdose Deaths—United States, 2000–2014*, 64  Morbidity & Mortality Wkly. Rep. 1378 (2016).

[9] *See* Amicus Curiae Brief of Healthcare Distribution Management Association in Support of Appellant Cardinal  Health, Inc., *Cardinal Health, Inc. v. United States Dept. Justice*, No. 12-5061 (D.C. Cir. May 9, 2012), 2012 WL  1637016, at *10 [hereinafter Brief of HDMA].

[10] Opioid Crisis, NIH, National Institute on Drug Abuse (available at https://www.drugabuse.gov/drugs-  abuse/opioids/opioid-crisis, last visited April 9, 2018) ("Opioid Crisis, NIH") (citing at note 1 Rudd RA, Seth P, David F, Scholl L. Increases in Drug and Opioid-Involved Overdose Deaths — United States, 2010–2015. MMWR Morb Mortal Wkly Rep 2016;65:1445–1452. DOI: http://dx.doi.org/10.15585/mmwr.mm655051e1)

[11] Opioid Crisis, NIH.

[12] *Id.* (citing at note 2 Florence CS, Zhou C, Luo F, Xu L, The Economic Burden of Prescription Opioid Overdose,  Abuse, and Dependence in the United States, 2013, *MED CARE* 2016;54(10):901-906,  doi:10.1097/MLR.0000000000000625).

tripled during 1999–2014. Among 47,055 drug overdose deaths that occurred in 2014 in the United States, 28,647 (60.9%) involved an opioid.[13]

56.        The rate of death from opioid overdose has quadrupled during the past 15 years in the United States. Nonfatal opioid overdoses that require medical care in a hospital or emergency department have increased by a factor of six in the past 15 years.[14]

57.        Every day brings a new revelation regarding the depth of the opioid plague: just to name one example, the New York Times reported in September 2017 that the epidemic, which now claims 60,000 lives a year, is now killing babies and toddlers because ubiquitous, deadly opioids are "everywhere" and mistaken as candy.[15]

58.        The epidemic of prescription pain medication and heroin deaths is devastating families and communities across the country.[16] Meanwhile, Defendant has helped the manufacturers and distributors of prescription opioids extract billions of dollars of revenue from the addicted American public while public entities experience tens of

---

[13] *See* Rose A. Rudd et al., *Increases in Drug and Opioid-Involved Overdose Deaths—United States, 2010–2015*, 65 Morbidity & Mortality Wkly. Rep. 1445 (2016).

[14] *See* Volkow & McLellan, *supra* note 1.

[15] Julie Turkewitz, 'The Pills are Everywhere': How the Opioid Crisis Claims Its Youngest Victims, N.Y. Times, Sept. 20, 2017 ("'It's a cancer,' said [grandmother of dead one-year old], of the nation's opioid problem, 'with tendrils that are going everywhere.'").

[16] *See* Presidential Memorandum – Addressing Prescription Drug Abuse and Heroin Use, 2015 Daily Comp. Pres. Doc. 743 (Oct. 21, 2015), https://www.gpo.gov/fdsys/pkg/DCPD-201500743/pdf/DCPD-201500743.pdf.

millions of dollars of injury caused by the  reasonably foreseeable consequences of the prescription opioid addiction epidemic.

59.          Defendant has  continued their wrongful, intentional, and unlawful conduct, despite their knowledge that   such conduct is causing and/or continuing to contribute to the national, state, and local opioid epidemic.

## VII.  TOLLING AND FRAUDULENT CONCEALMENT

### A.    Equitable Estoppel and Fraudulent Concealment

60.          Plaintiff continues to suffer harm from the unlawful actions by the Defendant.

61.          The continued tortious and unlawful conduct by the Defendant causes a repeated or continuous injury. The damages have not occurred all at once but have continued to occur and have increased as time progresses. The harm is not completed nor have all the damages been incurred until the wrongdoing ceases. The wrongdoing and unlawful activity by Defendant has not ceased. The public nuisance remains unabated.

62.          Defendant is equitably estopped from relying upon a statute of limitations defense because, alongside Purdue, the Defendant undertook active efforts to deceive Plaintiff and to purposefully conceal their unlawful conduct.  Defendant was aware that the opioid manufacturers, such as Purdue, and the distributors were fraudulently assuring the public and Plaintiffs that they were undertaking efforts to comply with their obligations under the state and federal controlled substances laws, all with the goal of protecting their registered manufacturer or distributor status in the State and to continue generating profits. Notwithstanding the allegations set forth above, McKinsey

and Purdue affirmatively assured the public and Plaintiff that they were working to curb the opioid epidemic.

63.     McKinsey and Purdue were deliberate in taking steps to conceal their conspiratorial behavior and active role in the deceptive marketing and the oversupply of opioids through overprescribing and suspicious sales, all of which fueled the opioid epidemic.

64.     McKinsey's consulting services were given confidentially, and both McKinsey and Purdue concealed the content of those services from the public.

65.     McKinsey and Purdue also concealed the existence of Plaintiff's claims by hiding their lack of cooperation with law enforcement and affirmatively seeking to convince the public that Purdue's legal duties to report suspicious sales had been satisfied through public assurances that they were working to curb the opioid epidemic. They publicly portrayed themselves as committed to working diligently with law enforcement and others to prevent diversion of these dangerous drugs and curb the opioid epidemic, and they made broad promises to change their ways insisting they were good corporate citizens.  These repeated misrepresentations misled regulators, prescribers, and the public, including Plaintiff, and deprived Plaintiff of actual or implied knowledge of facts sufficient to put Plaintiff on notice of potential claims.

66.     Plaintiff did not discover the nature, scope and magnitude of McKinsey's misconduct, and its full impact on Plaintiff, and could not have acquired such knowledge earlier through the exercise of reasonable diligence.

**B.     The Corporate Integrity Agreement**

67.        In May of 2007, Purdue Frederick Company, the parent company of Purdue Pharma L.P. ("Purdue") pleaded guilty to charges for misleading regulators, doctors, and the public regarding Purdue's opioid OxyContin. In pleading guilty, Purdue admitted to falsely marketing OxyContin as a less addictive, safer alternative to other pain medications.

68.        In the global settlement resolution, Purdue and its parent company paid over $600 million and entered into a Corporate Integrity Agreement with the U.S. Department of Health and Human Services Office of Inspector General.

69.        Under the Corporate Integrity Agreement, for five years, Purdue was required to refrain from making any deceptive or misleading claims about OxyContin and was obligated to submit regular compliance reports regarding its sales and marketing practices. Purdue was also required to monitor, report, and attempt to prevent inappropriate prescribing practices.

**C.     McKinsey's Role Following the Corporate Integrity Agreement**

**i.      The Sacklers Seek to Divert Money to Themselves**

70.        Following the guilty plea, the Sackler family, who controlled Purdue at all relevant times and is one of the richest families in the United States, sought to insulate themselves from the risk they perceived in Purdue.

71.        Email threads between the Sacklers in early 2008 indicate that the Sacklers had become concerned about personal liability regarding opioid-related misconduct.

72.        The Sacklers considered selling Purdue or merging with another pharmaceutical company as an option for limiting their risk. Mortimer Sackler Jr. advocated for a sale or

merger in a February 21, 2008 email to Dr. Richard Sackler (a former president and co-chairman of Purdue) and several others, writing "[t]he pharmaceutical industry has become far too volatile and risky for a family to hold 95% of its wealth in. It simply is not prudent for us to stay in the business given the future risks we are sure to face and the impact they will have on the shareholder value of the business and hence the family's wealth." The risk he referred to was, at least in significant part, further liability related to misconduct in the marketing and sale of OxyContin.

73.　　　　Alternatively, the Sacklers considered extracting as much wealth as possible from Purdue through distributions to themselves as shareholders. Such distributions would allow the Sacklers to diversify their assets and make their wealth less vulnerable to judgments regarding Purdue's sales and marketing of opioids, including OxyContin.

74.　　　　Either option -- a sale or significant distributions to shareholders -- would require Purdue to increase profitability in the short term. Purdue turned to McKinsey, with which it had an existing business relationship, for help maximizing sales of OxyContin given the requirements of the Corporate Integrity Agreement and the scrutiny that came along with it.

**ii.　　McKinsey Supplied Purdue with Granular Sales and Marketing Strategies and Remained Intimately Involved in Implementation**

75.　　　　McKinsey touts its model of engaging in transformational partnerships with its clients. Rather than giving one-off advice, McKinsey learns each client's business intimately and provides tailored, granular strategies.

76.　　　　McKinsey had begun collaborating with Purdue by June 2009.  McKinsey was tasked with increasing OxyContin sales despite the Corporate Integrity Agreement,

which required, among other things, that Purdue comport with FDA requirements and also included increased review and reporting obligations.

77.     McKinsey provided sales and marketing strategies designed to sell as much OxyContin as possible, at one point in 2010 telling Purdue that the new strategies McKinsey had developed could generate as much as $400,000,000 in additional annual sales. McKinsey worked with Purdue to implement the strategies, with McKinsey's ongoing and extensive involvement.

78.     OxyContin sales grew dramatically, and the Sacklers diverted the resulting profits into other holdings.

79.     In a 2009 report, among other sales strategies, McKinsey advised Purdue sales representatives to push the highest dosages of OxyContin, which were the most profitable for Purdue. In order to maximize dosages and improve targeting of the coordinated marketing strategy, McKinsey investigated the prescribing habits of individual physicians.

80.     McKinsey helped shape Purdue's OxyContin marketing, which misleadingly centered on freedom and peace of mind for users. The marketing was tailored to avoid running directly afoul of the Corporate Integrity Agreement, but it remained misleading given what Purdue and McKinsey knew about opioids. One advertisement said, "we sell hope in a bottle," despite the fact that both McKinsey and Purdue already understood the addiction problems associated with opioid use and abuse.  McKinsey encouraged Purdue to tell doctors that OxyContin would give their patients "the best possible chance to live a full and active life."

81.         McKinsey urged Purdue to train and incentivize its sales representatives to increase sales across the market for opioids, even if sales went to Purdue's competitors. This was intended to serve the Sackler family's goal of increasing the marketability of Purdue for potential mergers, but it had the effect of worsening the opioid crisis even beyond the portion of the crisis directly attributable to sales and use of OxyContin.

**D.     Project Turbocharge**

82.         The Corporate Integrity Agreement expired in 2012.  With this restriction lifted, McKinsey devised additional marketing and sales strategies for Purdue to further increase OxyContin sales.

83.         In the second half of 2013, McKinsey made recommendations to Purdue to increase OxyContin revenue, including "Turbocharging Purdue's Sales Engine."

84.         McKinsey's "Project Turbocharge" recommendations included revising the existing process for targeting high-prescribing physicians, with a shift from targeting solely on the basis of prescription deciles to considering additional factors. Based on its analysis, McKinsey told Purdue that "[t]here is significant opportunity to slow the decline of OxyContin by calling on more high-value physicians" and that "[t]he revenue upside from sales re-targeting and adherence could be up to $250 million."

85.         Also, as part of the "Project Turbocharge" recommendations, McKinsey determined and advised Purdue that the top half of prescribing physicians "write on average 25 times more scripts per prescriber" than the lower half.

86.         Despite knowing the then recently expired Corporate Integrity Agreement required Purdue to refrain from improperly incentivizing OxyContin sales, McKinsey also

recommended increasing incentive compensation for incremental OxyContin prescriptions, advising Purdue that "[r]evision to incentive comp could better align reps to Purdue's economics."

87.      At the same time, McKinsey recommended decreasing training by six days a year in order to allow employees more time to make sales calls. Meanwhile, McKinsey advised Purdue to exercise closer control over its sales staff in order to generate more efficient physician targeting.

88.      Physician targeting proved effective. McKinsey advised Purdue that visiting high-prescribing doctors many times per year increased sales.

89.      McKinsey recommended that Purdue circumvent pharmacies entirely with a mail order program because enforcement by federal regulators was decreasing OxyContin dispensing through Walgreens.

90.      At the board level, McKinsey urged the Sacklers to impose a "revenue growth goal" on management.

91.      With McKinsey's ongoing involvement and advice, Purdue implemented McKinsey's recommendations discussed above, but rebranded the program from Project Turbocharge to Evolve to Excellence.

92.      McKinsey's efforts had the effect the Sacklers had asked McKinsey to achieve. Sales of OxyContin tripled in the years following the 2007 guilty plea, despite the restrictions imposed by the Corporate Integrity Agreement. According to the U.S. Department of Justice, "[f]rom 2010 to 2018, Purdue's profits were almost entirely driven by its success in selling OxyContin."

93.     The Sacklers did not sell Purdue or enter into a merger, but their goal of extracting wealth from the business was realized. The Sackler family has withdrawn over $10 billion from Purdue since 2008, including $1.7 billion in 2009 alone. These distributions were made possible by McKinsey's services and came at the expense of a deepening national opioid crisis.

**E.    McKinsey Knew About Dangers of Opioids and Acted to Maximize OxyContin Prescriptions Anyways**

94.     McKinsey has a long history of consulting in the pharmaceutical industry. In addition to its work with Purdue, McKinsey has performed "opioid-related work" for Johnson & Johnson, Endo International, and Mallinckrodt Pharmaceuticals. For instance, a McKinsey PowerPoint presentation prepared for Johnson & Johnson recommended that Johnson & Johnson aggressively target and influence doctors treating back pain in order to increase opioid sales.

95.     Purdue's 2007 guilty plea put McKinsey on notice of Purdue's misconduct. By that time, McKinsey had access to public information indicating that OxyContin and other opioids pose significant risk of addiction and misuse.

96.     McKinsey's presentations to Purdue in 2013 included extensive discussion of doctors' concerns about opioid misuse and side effects, demonstrating McKinsey's awareness of the dangers of opioids. Rather than working to limit these disastrous effects, McKinsey treated doctors' misgivings as obstacles to confront with new messaging.

97.     McKinsey continued working with Purdue long after the severity of the opioid crisis was well known. In 2017, McKinsey proposed that Purdue pay CVS and other

distributors of OxyContin rebates "for every OxyContin overdose attributable to pills they sold."

98.      A former McKinsey consultant described McKinsey's work with Purdue as "the banality of evil, M.B.A. edition...They knew what was going on. And they found a way to look past it, through it, around it, so as to answer the only questions they cared about: how to make the client money, and when the walls closed in, how to protect themselves."

99.      In a 2018 email thread, apparently fearing consequences for McKinsey's work with Purdue, two McKinsey senior partners who had participated in McKinsey's work advising Purdue discussed deleting documents related to opioids.

**F.      Purdue's 2020 Guilty Plea and McKinsey's Recent Statement**

100.      In October of 2020, Purdue once again reached an agreement (the "2020 Settlement Agreement") with the U.S. Department of Justice to enter a guilty plea related to its marketing of OxyContin. The agreement includes $8.3 billion in penalties from Purdue and $225 million from the Sackler family.

101.      In the 2020 Settlement Agreement, Purdue pleaded guilty to defrauding health agencies, violating anti-kickback laws, paying illegal kickbacks to doctors, and "using aggressive marketing tactics to convince doctors to unnecessarily prescribe opioids-- frivolous prescriptions that experts say helped fuel a drug addiction crisis that has ravaged America for decades."

102.      The 2020 Settlement Agreement was entered by Purdue and the United States government. It explicitly states that it does not release Purdue of "[a]ny liability for

claims of the states or Indian tribes."

103.        The 2020 Settlement Agreement includes a provision specifically reserving claims

regarding "[a]ny liability of entities other than the [Purdue Bankruptcy] Debtors,

including consultants."

104.        On December 5, 2020, McKinsey issued the following statement regarding its

work with Purdue:

*December 5, 2020*—As we look back at our client service during the opioid crisis,
we recognize that we did not adequately acknowledge the epidemic unfolding in
our communities or the terrible impact of opioid misuse and addiction on
millions of families across the country. That is why last year we stopped doing
any work on opioid-specific business, anywhere in the world.

Our work with Purdue was designed to support the legal prescription and use of
opioids for patients with legitimate medical needs, and any suggestion that our
work sought to increase overdoses or misuse and worsen a public health crisis is
wrong. That said, we recognize that we have a responsibility to take into account
the broader context and implications of the work that we do. Our work for
Purdue fell short of that standard.

We have been undertaking a full review of the work in question, including into
the 2018 email exchange which referenced potential deletion of documents. We
continue to cooperate fully with the authorities investigating these matters.

105.        In recent weeks, McKinsey has settled opioid-related claims with 49 states, the

District of Columbia, and five U.S. territories for approximately $600 Million Dollars.

**G.     Impact of Opioid Abuse, Addiction and Diversion**

106.        The Opioide Epidemic visited upon the City of Austin had its origins in the

introduction of opiate based medications, without disclosing their highly addictive

propensity. In 2015, a HIV explosion occurred linked to opioide abuse using tainted

needles. The HIV rates *per capita* in the City of Austin were among the highest in the

United States. This opioid abuse and HIV infection rates were well known throughout

the community and included virtually each and every employee and representative of the City of Austin. An effort to inquire into such knowledge and by whom would be beyond any discovery obligations imposed on the City of Austin.

107.        In the course of its business, McKinsey unfairly and unconscionably worked with certain of its opioid manufacturing clients to aggressively promote and sell more opioids to more patients for longer periods of time.

**VIII.  CAUSES OF ACTION**

108.        Plaintiff realleges and incorporates by reference each and everyallegation contained in the preceding paragraphs as if they were set out herein.

**COUNT I**

**NEGLIGENCE**

108.        McKinsey, through its work with Purdue, owed a duty to use reasonable care to prevent causing harm to the Plaintiff and the Class resulting from pursuant encouraging the over-marketing and over-prescribing of a controlled substance known at the time to be addictive and known at the time to be a threat to public health in the State of Indiana and particularly in the Plaintiff Communities.

109.        In violation of this duty, for years McKinsey devised and assisted Purdue with implementing a sales and marketing campaign, including *Project Turbocharge*, that would dramatically increase the amount of OxyContin prescribed and distributed throughout Plaintiff's and the Class' communities.  In the process, McKinsey continually

devised misleading claims regarding OxyContin as part of their efforts to get health care providers to write more and more OxyContin prescriptions.

110.     As a direct and proximate result of McKinsey's conduct, the Plaintiff and the Class have been damaged, and will continue to be damaged, and seek all legal and equitable relief as allowed by law, including, *inter alia*, actual damages, compensatory damages, punitive damages, treble damages, equitable relief, forfeiture as deemed proper by the Court, attorneys' fees and all costs and expenses of suit and pre- and post-judgment interest.

## COUNT II

### FRAUD AND MISREPRESENTATION

111.     McKinsey, in the course of its business with Purdue, has committed misrepresentation, deceit, concealment and fraud through:

a.   the willful, reckless or mistaken representations of materials facts;

b.   the suppression of material facts that Defendant were under a duty to communicate;

c.   the concealment of material facts with the intent to deceive and mislead;

d.   the misrepresentation of material facts made willfully to induce actions to the Plaintiff's detriment; and

e.   the intentional misrepresentation of material facts with knowledge of the falsity of the representations with intent the Plaintiff would rely on the representations to their detriment.

112.      In an effort to mislead the public concerning risks, benefits and safety of prescription opioids, the Defendant worked both individually and in concert to deceptively market and falsely present Purdue's products.

113.      McKinsey, in the course of its business with Purdue, failed to exercise reasonable care or competence when obtaining and communicating false information regarding Purdue's opioids that McKinsey knew would be used for the guidance of others in their business transactions, including the healthcare providers within Plaintiff's and the Class Member's communities who were capable of prescribing Purdue's drugs.

114.      Plaintiff's and the Class' communities are among the limited group of entities to whom McKinsey knew Purdue intended to supply the false information regarding opioids.

115.      McKinsey knew that the false information was material to healthcare providers' decision to prescribe opioids to patients. McKinsey intended that such statements be relied upon to encourage additional opioid prescriptions.

116.      McKinsey made and caused to be made false representations to healthcare providers working in Plaintiff's and the Class' communities, and/or omitted material facts, regarding the risks, efficacy, and medical necessity of opioids, generally, and Purdue's opioids, specifically. McKinsey knew these representations were false, made recklessly without knowledge of the truth, and/or had no reasonable ground for believing such assertions. Specifically, McKinsey knowingly and/or recklessly:

a.  downplayed the substantial risks of addiction and other side-effects of opioids, generally, and Purdue's opioids, specifically, including crafting Purdue's

marketing plan to affirmatively state in sales calls and other marketing channels that Purdue's drugs were not as addictive or prone to abuse as they truly are; stating that classic signs of addiction were actually an indication of "pseudoaddiction" requiring additional administration of opioids, and omitting the high risks of addiction actually present;

b.  overstated the efficacy of opioids, generally, and Purdue's opioids, specifically, including making false statements regarding the effectiveness of the drugs for treating specific subsets of the patient population (i.e., those with osteoarthritis) and their ability to improve patient function; and

c.  misrepresented the medical usefulness and necessity of opioids, generally, and Purdue's opioids, specifically, including affirmatively marketing their drugs for off label uses (i.e., osteoarthritis) without solicitation and not in response to questions from healthcare providers.

117.    McKinsey and Purdue's misrepresentations and omissions had a tendency to deceive others, to violate public confidence, and/or injure public interests. McKinsey, having chosen to craft the marketing plan used by Purdue to make representations to healthcare providers regarding their opioids, were under a duty to disclose the whole truth, and not disclose partial and misleading truths.

118.    McKinsey intended healthcare providers to rely upon McKinsey's false assertions regarding the risks, efficacy, and medical necessity of opioids, generally, and Purdue's opioids, specifically, to increase the number of opioid prescriptions made by healthcare providers.

119.     Healthcare providers working in Plaintiff's and the Class' communities did in fact rely on the false representations made in Purdue's marketing plan created by McKinsey and implemented with McKinsey's assistance.

120.     McKinsey acted with knowledge and willful intent, with reckless disregard for the rights of others, and/or intentionally and with malice towards others. As such, Plaintiff and the Class seek to recover punitive damages against McKinsey.

121.     As a proximate result of McKinsey's conduct, Plaintiff and the Class have incurred excessive costs related to the diagnosis, treatment, and cure of addiction or risk of addiction to opioids.  Plaintiff and the Class have borne the massive costs of these illnesses and conditions by having to provide necessary resources for care, treatment facilities, law enforcement services, and to allocate limited resources to combat the devasting social effects of the opioid epidemic.

122.     Defendant's fraud and misrepresentation has exacted a financial burden for which the Plaintiff seeks relief and damages.  Plaintiff and the Class seek to recover all damages caused by McKinsey's fraudulent representations and omissions.

123.     As a proximate result of the Defendant's conduct, the Plaintiff has been damaged, and will continue to be damaged, and seek all legal and equitable relief as allowed by law, including, *inter alia*, actual damages, compensatory damages, punitive damages, treble damages, equitable relief, forfeiture as deemed proper by the Court, attorneys' fees and all costs and expenses of suit and pre- and post-judgment interest.

## COUNT III

## PUBLIC NUISANCE

124.     Plaintiff brings this claim against McKinsey under Indiana law which confers upon Plaintiff counties the power to suppress all nuisances that are or may be injurious to the health and welfare of their respective communities.  Plaintiff further seeks to recover costs associated with the nuisance and its abatement.

125.     Indiana has found that a prohibited activity under its public nuisance statutes can include the illegal manufacture, sale or distribution of, or possession with intent to manufacture, sell, or distribute, a controlled dangerous substance, which include opiates.  Plaintiff has the right and the power to suppress nuisances.

126.     The Defendant is liable for public nuisance because its conduct at issue has caused an unreasonable and substantial interference with a right common to the general public, which is the proximate cause of, and/or substantial factor leading to, Plaintiff's injuries.

127.     McKinsey has created and continues to perpetuate and maintain a public nuisance throughout the Plaintiff's and the Class's communities through the massive distribution of millions of doses of highly addictive, commonly abused prescription pain killers known as opioids and a campaign of false information regarding opioids.

128.     Defendant engaged in conduct or omissions which endanger or injure the property, health, safety, and comfort of the persons in the Plaintiff's and the Class's communities. This conduct consisted of, but is not limited to, the production,

promotion, and marketing of opioids for use by the residents of the Plaintiff's and the Class's communities.

129.    Defendant's actions have caused considerable hurt, inconvenience, and damage to all members of the public.

130.    Defendant's conduct is not only unlawful but has also resulted in substantial and unreasonable interference with public health and safety.

131.    Defendant's conduct is not insubstantial or fleeting. Defendant's conduct has so severely impacted public health on every geographic and demographic level that the public nuisance perpetrated by this conduct is commonly referred to as the opioid "crisis" or "epidemic."

132.    McKinsey's actions have caused deaths, serious injuries, and a severe disruption of public peace, order, and safety; it is ongoing, and it is producing permanent and long-lasting damage. The harm caused by Defendant's conduct is not fanciful, or such as would affect only one of fastidious taste. Rather, Defendant's conduct is such that it affects numerous ordinary, reasonable persons.

133.    McKinsey's conduct, including its misrepresentations and omissions regarding opioids, generally, and Purdue's opioids, specifically, have fueled an opioid epidemic within the Plaintiffs' and the Class's communities that constitutes a public nuisance. McKinsey and Purdue knowingly exacerbated a condition that affects entire municipalities, towns, and communities.  McKinsey's annoyance, injury, and danger to the comfort, repose, health, and safety of Plaintiff's and the Class's communities includes, inter alia:

a.  The high rates of use leading to unnecessary opioid abuse, addiction, overdose, injuries, and deaths;

b.  Even children have fallen victim to the opioid epidemic.   Easy access to prescription opioids made opioids a recreational drug of choice among teenagers.   Even infants have been born addicted to opioids due to prenatal exposure, causing sever withdrawal symptoms and lasting developmental impacts;

c.  Even those residents of the County who have never taken opioids have suffered from the public nuisance arising from Defendant's abdication of their gatekeeper duties and fraudulent promotions.   Many residents have endured both the emotional and financial costs of caring for loved ones addicted to or injured by opioids, and the loss of companionship, wages, or other support from family members who have used, abused, become addicted to, overdosed on, or been killed by opioids.;

d.  The opioid epidemic has increased health care costs;

e.  The diversion of opioids into the secondary, criminal market and the increased numbers of individuals who abuse or are addicted to opioids increased the demands on health care services and law enforcement;

f.  The significant and unreasonable interference with the public rights caused by Defendant's conduct taxed the human, medical, public health, law enforcement, and financial resources of the Plaintiff and Plaintiff's Community;

g.  prescription opioid addiction often leads to illicit opioid use and addition;

h.  according to the Centers for Disease Control, past misuse of prescription opioids is the strongest risk factor for heroin initiation and use;

i.  Indiana's hospitals are reporting increasing numbers of newborns testing positive for prescription medications;

j.  McKinsey's crafted deceptive marketing strategies that were prepared for Purdue, purchased by Purdue, and implemented by Purdue with McKinsey's ongoing assistance. These strategies enflamed, purposefully, an opioid abuse and addiction epidemic that has caused Plaintiff's and the Class's communities to bear enormous social and economic costs including increased health care, criminal justice, and lost work productivity expenses, among others;

k.  Employers have lost the value of productive and health employees;

l.  Defendant's conduct created and abundance of drugs available for criminal use and fueled a new wave of addiction, abuse, and injury; and

m.  Defendant's dereliction of duties and/or fraudulent misinformation campaign pushing dangerous drugs resulted in a diverted supply of narcotics to sell, and the ensuing demand of addicts to buy them.  More prescription opioids sold by Defendant led to more addiction, with many addicts turning from prescription opioids to heroin.  People addicted to opioids frequently require increasing levels of opioids, and many turned to heroin as a foreseeable result.

134.    McKinsey's actions have created a public nuisance.

135.    The public nuisance created by McKinsey is within control of McKinsey.

136.    The public nuisance created by Defendant is the result of repeated and

continuing  conduct which requires the expenditure of funds by Plaintiff on an ongoing and continuous basis.

137.        Defendant caused a significant and unreasonable interference with the public health, safety, welfare, peace, comfort and convenience, and ability to be free from  disturbance and reasonable apprehension of danger to person or property.

138.        Defendant's actions have been of a continuing nature and have produced a significant effect upon the public's rights, including the public's right to health and safety.

139.        Defendant's ongoing conduct produces an ongoing nuisance, as the prescription  opioids that their deceptive business practices cause to be distributed and possessed have and will continue to lead to abuse, addiction, crime, and public health costs.

140.        Because of the continued use and addiction, the public will continue to fear for its health, safety and welfare, and will be  subjected to conduct that creates a disturbance and reasonable apprehension of danger to  person and property.

141.        Defendant knew or reasonably should have known that their conduct will have an  ongoing detrimental effect upon the public health, safety and welfare, and the public's  ability to be free from disturbance and reasonable apprehension of danger to person and  property.

142.        Defendant knew or reasonably should have known that their conduct causes an unreasonable invasion of the public right to health, safety and welfare and the public's ability to be free from disturbance and reasonable apprehension of danger to

person and property.

143.     Defendant's conduct in marketing and selling prescription opioids,   which the Defendant knew or reasonably should have known will likely cause addiction, abuse, and subsequent negative effects, is reasonably foreseeable and creates a strong likelihood that these illegal distributions of  opioids will cause death and injuries and otherwise  significantly and unreasonably interfere with  public health, safety and welfare, and with  the public's right to be free from disturbance and reasonable apprehension of danger to  person and property.

144.     Defendant's actions were, at the least, a substantial factor in opioids becoming widely available and widely used for non-medical purposes.

145.     The consequence of prescription opioid abuse directly and proximately results in significant costs to the Plaintiff and the Class in  order to enforce the law, treat the victims of opioid abuse and  addiction, and to otherwise care for communities ravaged by this epidemic.

146.     Defendant's conduct is a direct and proximate cause of deaths and injuries to the  residents of Indiana, and a significant and unreasonable interference with public health, safety and welfare, and with the public's right to be free from disturbance and reasonable apprehension of danger  to person and property.

147.     Defendant's deceptive  and  illegal business practices  constitute  a  public nuisance and, if unabated, will continue  to threaten the health, safety and welfare of the residents of Indiana creating  an atmosphere of fear and addiction that tears at the residents' sense of well-being and  security. Plaintiff has a clearly ascertainable

right to abate conduct that perpetuates this nuisance.

148.      Defendant acted recklessly, negligently and/or carelessly, thereby creating an
unreasonable risk of harm.

149.      Defendant acted with actual malice because Defendant acted with a conscious
disregard for the rights and safety of other persons, and said actions have a great
probability of causing substantial harm.

150.      The damages available to the Plaintiff and the Class include, *inter alia*,
recoupment of governmental costs, flowing from an ongoing and persistent public
nuisance which the government seeks to abate. Defendant's conduct is ongoing and
persistent, and the Plaintiff and the Class seek all damages flowing from Defendant's
conduct.

151.      Plaintiff and the Class seek to abate the nuisance and harm created by
Defendant's conduct.

152.      As a direct result of Defendant's conduct, the Plaintiff and the Class have
suffered actual injury and damages including, but not limited to, significant expenses
for police, emergency, health, prosecution, corrections and other services.

153.      The Plaintiff and the Class have sustained specific and special injuries because its
damages include, inter alia, health services, law enforcement expenditures, and costs
related to opioid addiction treatment and overdose prevention.

154.      The Plaintiff and the Class further seek to abate the nuisance created by the
Defendant's unreasonable, unlawful, intentional, ongoing, continuing, and persistent
actions and omissions and interference with a right common to the public.

155.　　　　Plaintiff and the Class seek all legal and equitable relief as allowed by law, including inter alia abatement, compensatory damages, and punitive damages from the Defendant for the creation of a public nuisance, attorney fees and costs, and pre- and post-judgment interest.

156.　　　　The staggering rates of opioid and heroin use resulting from the Defendant's actions have caused harm to the entire community that includes, but is not limited to:

a. the high rates of use leading to unnecessary opioid abuse, addiction, overdose, injuries, and deaths;

b. recreational opioid use among teenagers;

c. infants have been born addicted to opioids due to prenatal exposure, causing severe withdrawal symptoms and lasting developmental impacts;

d. residents have endured both the emotional and financial costs of caring for loved ones addicted to or injured by opioids, and the loss of companionship, wages, or other support from family members who have used, abused, become addicted to, overdosed on, or been killed by opioids;

e. the opioid epidemic has increased health care costs;

f. employers have lost the value of productive and healthy employees;

g. Defendant's conduct created an abundance of drugs available for criminal use and fueled a new wave of addiction, abuse, and injury;

h. increase in prescription opioids sold led to more addiction, with many addicts turning from prescription opioids to heroin. People addicted to opioids frequently require increasing levels of opioids, and many turned to heroin as a foreseeable result;

i. the diversion of opioids into the secondary, criminal market and the increased number of individuals who abuse or are addicted to opioids increased the demands on health care services and law enforcement;

j. taxed the human, medical, public health, law enforcement, and financial resources of Plaintiff and the Class; and

       k. Defendant's interference with the comfortable enjoyment of life in the Plaintiff's and the Class's community is unreasonable because there is little social utility to opioid diversion and abuse, and any potential value is outweighed by the gravity of the harm inflicted by Defendant's actions.

157.      The harm is not outweighed by any utility of the Defendant's behavior. There is no legitimate interest in the spreading of false information regarding a known addictive drug.

158.      Plaintiff seeks all legal and equitable relief as allowed by law , including *inter alia* injunctive relief, restitution, disgorgement of profits, compensatory and punitive damages, and all damages allowed by law to be paid by the Defendant, attorney fees and costs, and pre- and post-judgment interest.

159.      Plaintiff and the Class seek to abate the public nuisance McKinsey enflamed and all necessary relief to abate such public nuisance.

## COUNT IV

## CIVIL CONSPIRACY

160.      McKinsey and Purdue, working together for decades, agreed to commit numerous unlawful acts relating to the sales and marketing of Purdue's opioid products. McKinsey and Purdue also agreed to use unlawful means to commit lawful acts as part of these sales and marketing efforts.

161.      McKinsey and Purdue agreed to pursue the unlawful act of knowingly misrepresenting the addictive nature of opioids in marketing OxyContin to health care providers within Plaintiff's and the Class' communities.

162.  McKinsey and Purdue deployed the unlawful means of evading Purdue's reporting and compliance obligations to the Inspector General of the United States Department of Health and Human Services for the five years Purdue was subject to a Corporate Integrity Agreement after it pled guilty in 2007 to criminal misbranding. McKinsey assisted Purdue with evading these compliance obligations to accomplish the lawful act of maximizing OxyContin revenue to Purdue.

163.  McKinsey and Purdue conspired to violate Indiana law, including but not limited to Indiana's opioid marketing, sales, and distribution requirements as well as Indiana's consumer protection laws.

164.  McKinsey and Purdue engaged in deceptive trade practices including making and causing to be made misrepresentations and omissions in marketing of opioids in general, and Purdue's opioids, specifically, that deceived or could reasonably be expected to deceive or mislead consumers.

165.  McKinsey and Purdue engaged in unfair trade practices, including intentionally downplaying of the risks, overstating the benefits, and misrepresenting the medical necessity of opioids, generally, and Purdue's opioids, specifically, including for off-label uses. These practices offend established public policy and are immoral, unethical, oppressive, unscrupulous, or substantially injurious to consumers.

166.  As a result of McKinsey's conspiratorial activities, the sales volume of prescription opioids increased dramatically, along with revenues, with a corresponding increase of illegitimate, improper and illegal prescription opioids being distributed to the public

167.     McKinsey knowingly made or caused to be made false or misleading representations as to the characteristics, ingredients, uses, and benefits of opioids, generally, and Purdue's opioids, specifically, by downplaying the risks of addiction and abuse, overstating the efficacy, and misrepresenting the medical necessity of opioids, generally, and Purdue's opioids, specifically.

168.     McKinsey, a majority of the Purdue board, and Purdue agreed to deploy unlawful sales and marketing tactics to achieve the lawful purpose of maximizing revenue of a closely held company.

169.     As a consequence, McKinsey is responsible, liable, and accountable for the improper sales and marketing practices used to promote Purdue's opioid products including OxyContin.

170.     Defendant's conspiracy has exacted a financial burden for which the Plaintiff seek relief and damages.  As a proximate result of the Defendant's conduct, the Plaintiff has been damaged, and will continue to be damaged, and seek all legal and equitable relief as allowed by law, including, *inter alia*, actual damages, compensatory damages, punitive damages, treble damages, equitable relief, forfeiture as deemed proper by the Court, attorneys' fees and all costs and expenses of suit and pre- and post-judgment interest.

### COUNT V

**WANTON-INTENTIONAL CONDUCT**

171.     The Defendant's actions, separately and severally, are the product of their conscious disregard of the rights and safety of the citizens of Plaintiff's and the Class'

communities, with the attendant awareness that harm will (and has) likely result from the Defendant's actions.

172.      The Defendant's actions, separately and severally, are the product of their conscious disregard of the rights and safety of the citizens of Plaintiff's and the Class' communities, with the attendant awareness that harm will (and has) likely result from the Defendant's actions.

173.      The actions of the Defendant are set forth in the preceding counts and paragraphs of this Complaint and are incorporated herein by reference.   The Defendant's actions are willful, wanton, intentional and committed with reckless disregard for the rights and safety of the citizens of Plaintiffs' and the Class' communities.

174.      The conduct of the Defendant has been, and continues to be, willful as defined by Indiana law such that Defendant were aware that their actions, as well as their failure to act in stopping and preventing improper opioid distribution, would cause harm to the public.

175.      While the Defendant may not have intended harm to the specific named Plaintiff's and the Class' communities in this case, the Defendant knew their breach of their legal duties would cause great harm to the American public and Louisianians in particular yet they proceeded in their efforts to distribute and sell prescription opioids in disregard of the rights and safety of the citizens of Plaintiff's and the Class' communities.

176.     The actions of the Defendant, separately and severally, have combined and concurred to harm Plaintiff's and the Class' Communities, and the actions of the Defendant have all contributed to cause the Plaintiff's and the Class' damages.

177.     The actions of the Defendant have, and continue to be, carried on with a reckless and/or conscious disregard for the rights, welfare and safety of the citizens of Plaintiff's and the Class' communities.

178.     The actions of the Defendant have, and continue to be, the source of unjust hardship to the citizens of Plaintiff's and the Class' communities.

179.     The actions of the Defendant have, and continue to be, wrongful actions without just cause or excuse.

180.     The Plaintiff and the Class demand judgment from the Defendant in an amount of money sufficient to punish the Defendant for their wrongful conduct and to protect the public by deterring and discouraging the Defendant and others from doing the same or similar wrongs in the future.

## COUNT VII

### INDIANA UNFAIR TRADE PRACTICES AND CONSUMER PROTECITON LAW

182.     Such actions as described above constitute unfair trade practices that are prohibited by Indiana Code 24-5-0.5-3 of the Indiana Deceptive Consumer Sales Act.

183.     The acts or practices described herein occurred in trade or commerce as defined in Indiana Code 24-5-0.5-2(a)(1) and (a)(3).

184.     These acts or practices injured consumers in the City of Austin and the Class.

McKinsey's actions directly and proximately caused the City of Austin's injuries.

### VIII.     CLASS ALLEGATIONS

185.     Plaintiff brings this action pursuant to the provisions of Rule 23(a) and 23(b)(3) of

the Federal Rules of Civil Procedure as a Class Action on their own behalf and on behalf

of all other persons similarly situated.   This action satisfies the numerosity,

commonality, typicality, predominance, and superiority requirements of Fed. R. Civ. P.

23(a) and 23(b)(3).

**A.     Class Definition**

186.     Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil

Procedure on behalf of themselves and all members of the class who have been

impacted by Defendant's actions and omissions as follows:

a. all Indiana Counties for the period of 2004 to the present ("County Class");
   and

b. all Indiana Cities, Towns and/or Municipalities for the period of 2004 to the
   present ("Municipality Class").

187.     Plaintiff reserves the right to amend or modify the Class definitions with greater

specificity where and as necessary, including to conform to the evidence, for purposes

of resolution or settlement.

**B.     Class Requirements**

188.     The putative classes are sufficiently numerous that joinder of each absent Class

Member would be both impracticable and inefficient.

189.     There are questions of law and fact common to the Class, which predominate over any questions affecting only individual Class Members. These common questions of law and fact include, without limitation:

a. Defendant's conduct in creating, proposing, and implementing sales and marketing strategies for opioids manufactured by Purdue before and after Purdue's first guilty plea in 2007 relating to misbranding of OxyContin;

b. Whether Defendant performed reasonable due diligence in ascertaining the risks associated with Defendant's strategies for "turbocharging" OxyContin sales at Purdue in 2013 and thereafter;

c. Whether Defendant's implementation of its own sales and marketing strategies for its client, Purdue, caused or contributed to an increase in opioid addiction;

d. Whether Defendant's conduct with respect to developing and implementing nationwide opioid sales and marketing practices at Purdue was negligent, grossly negligent, or reckless;

e. Whether Defendant's conduct with respect to developing and implementing nationwide opioid sales and marketing practices at Purdue caused or contributed to causing a public nuisance;

f. Whether Defendant's conduct with respect to developing and implementing nationwide opioid sales and marketing practices at Purdue constituted fraudulent misrepresentations to healthcare providers regarding the safety of Purdue's opioid products;

g. Whether Defendant conspired with or aided and abetted Purdue with respect to developing and implementing nationwide opioid sales and marketing practices at Purdue; and

h. Whether Defendant's acceptance of funds from Purdue and other opioid manufacturers regarding Defendant's work promulgating and implementing

nationwide opioid sales and marketing strategies constitutes unjust enrichment.

190. Plaintiff's claims are typical to the claims of the Class. Plaintiff and all Class Members were exposed to undeviating behavior and sustained damages arising out of and caused by Defendant's unlawful conduct.

191. Plaintiff's interest is directly aligned with the absent Class Members and, as such, Plaintiffs will fairly and adequately represent and protect the interests of the absent Class Members.  Plaintiff has retained counsel experienced in the prosecution of class action litigation who will adequately represent the interests of the putative class. Further, Plaintiff is unaware of any conflicts between Plaintiff and the absent Class Members.

192. Plaintiff has, or can acquire as necessary, sufficient financial and legal resources to assure that the interests of the Class Members will be protected. Further, Plaintiff is knowledgeable concerning the subject matter of this action and have, and will, assist class counsel as necessary in the prosecution of this matter.

193. The prosecution of Plaintiff's claim on an *ad hoc* basis would create a substantial risk of inconsistent and/or varying legal outcomes that would establish incompatible standards of conduct.  Class certification would alleviate these issues and provide for an orderly, timely, and efficient resolution for each Class Member as well as the Court.

194. The prosecution of Plaintiff's class claims on an individual *ad hoc* basis is inappropriate where Defendant have admittedly acted in such a manner that final declaratory and injunctive relief is both necessary and required.  Similarly, *ad hoc* litigation is inappropriate where declaratory and injunctive relief is warranted to the

Class Members as whole.

195.          Given the putative class is comprised solely of Indiana Parishes and Municipalities, the class action procedural mechanism is appropriate and provides a superior means of resolution.

## IX.          REQUEST FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter an Order:

1.      Certifying a class as described hereinabove.

2.      Adjudging and decreeing that McKinsey has engaged in the acts or practices complained of herein, and that constitute unfair acts or practices in Violation of Indiana Code 24-5-0.5-3.

3.      Issuing permanent injunction prohibiting McKinsey, its agents, servants, employees, and all other persons and entities, corporate or otherwise, in active concert or participation with any of them, from engaging in trade practices;

4.      Ordering McKinsey to make such financial payments as are authorized by law.

5.      Ordering McKinsey to pay all costs for the prosecution and investigation of this action.  Ordering such other and further relief as may be appropriate in the circumstances.

RESPECTFULLY SUBMITTED,

HOUSTON, THOMPSON and LEWIS, PC

*/s/ Joshua A. Stigdon*
Joshua A. Stigdon, Esq., #29501-72
49 E. Wardell Street
Scottsburg, IN  47170
(812) 752-5920 – telephone
(812) 752-6989 – fax
jstigdon@htllawyers.com

OF COUNSEL:

THE DUDENHEFER LAW FIRM, L.L.C.
Frank C. Dudenhefer
2721 Saint Charles. Avenue
Suite 2A
New Orleans, Louisiana 70130
(504) 616-5226
fcdlaw@aol.com